ORIGINAL



1  KAREN P. HEWITT
   United States Attorney
2  MELANIE K. PIERSON
   Assistant U.S. Attorney
3  California State Bar No. 112520
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-5685/(619) 557-7055 (fax)
   Melanie.Pierson@usdoj.gov
6

7  Attorneys for Plaintiff
   United States of America
8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11  UNITED STATES OF AMERICA,          )    Criminal Case No.07cr3192-IEG
                                       )
12              Plaintiff,             )    DATE:  January 7, 2008
                                       )    TIME:  2:00 p.m.
13       v.                            )
                                       )    GOVERNMENT'S RESPONSE IN
14  GUILLERMO GARCIA (1),              )    OPPOSITION TO DEFENDANT'S
                                       )    MOTIONS:
15              Defendant.             )
                                       )    (1)  TO COMPEL DISCOVERY;
16                                     )    (2)  TO PRESERVE EVIDENCE;
                                       )    (3)  FOR FURTHER MOTIONS;
17                                     )
                                       )    TOGETHER WITH STATEMENT OF
18                                     )    THE CASE, STATEMENT OF FACTS,
                                       )    AND MEMORANDUM OF POINTS
19                                     )    AND AUTHORITIES
                                       )
20  _____)

21                              I

22                    STATEMENT OF THE CASE

23        On November 27, 2007, a federal grand jury returned a four count indictment against Guillermo

24  Garcia and Ivan Garcia Oliver, charging them with Conspiracy, in violation of Title 18, United States

25  Code, Section 371; Unlawful Discharge of Pollutants, in violation of Title 33, United States Code,

26  Sections 1311, 1319(c)(2)(A) and 1342; Unlawful Disposal of Hazardous Waste, in violation of Title 42,

27  United States Code, Section 6928(d)(2); and charging defendant Guillermo Garcia with Failure to

28  Report a Release of a Hazardous Substance, in violation of Title 42, United States Code, Section 9603.

1      On November 28, 2007, defendant Guillermo Garcia was arrested.  He was arraigned in
2  November 29, 2007, and was released on a $20,000 personal surety bond.  The defendant was ordered
3  to return to federal district court for a hearing on all motions on January 7, 2008, at 2:00 p.m.

4      Codefendant Ivan Garcia Oliver is currently incarcerated, facing charges in Lake County,
5  California, in connection with an alleged homicide.  A federal writ has been issued, requesting that
6  Oliver be brought to this district for arraignment on January 30, 2008, at 1:30 p.m.  A continuance of
7  the current motions date of January 7, 2008, is sought to allow the defendants to proceed to trial
8  together.

9

## II

10

## STATEMENT OF FACTS

11      In March 2005, Wagner Construction ("Wagner") was located at 12512 Slaughterhouse Canyon
12  Drive in Lakeside, California.  Wagner was in the process of closing their Lakeside facility and
13  consolidating their business in Florida.  At the time, Wagner had two full time employees working at
14  the yard: Guillermo "Willy" Garcia, (the supervisor) and his brother, Ivan Garcia Oliver (a laborer).

15      In the early morning hours (beginning about 4:00 a.m.) of March 31, 2005, employees of a
16  neighboring business, Superior Ready Mix, noticed a very strong chemical odor emanating from the
17  creek behind the premises of the facility.  When the Superior Ready Mix supervisor arrived at work at
18  9:00 a.m., he also smelled the odor and attempted to determine its location.  He noticed that the odor
19  was coming from the creek, and specifically the conduit that channeled Slaughterhouse Canyon Creek
20  under the roadway from Wagner's property to Superior's property.

21      He walked over to Wagner's yard to investigate, taking his digital camera.  He saw two Hispanic
22  males in the Wagner yard when he arrived, one of which he knew as "Willy" (later identified as
23  Guillermo "Willy" Garcia).  The Superior Ready Mix supervisor asked Willy if there had been a spill
24  at Wagner, mentioning the strong odor coming from the creek.  Willy said he would "look into it."  He
25  and Willy walked around the Wagner yard to investigate the origin of the odor.  Willy told him
26  "something was spilled last night."  The Ready Mix supervisor saw no evidence of a spill on the ground
27  nor on the rocks leading to the creek, but did notice the same odor in the creek and a waxy material
28  floating in the creek behind Wagner's property.

1    The Ready Mix supervisor also noticed five black plastic 55 gallon drums lined up against the

2 outside of the office trailer.  He observed a hand pump attached to the opening of one of the drums.

3 There were no labels visible on the drums.  The Ready Mix supervisor believed that the drums were

4 empty, as he looked inside the ones that were open and kicked the drums.  He photographed the Wagner

5 yard and the five drums lined up by the office trailer at about 9:20 a.m.  These five drums were the only

6 black plastic drums he observed on the premises as he walked the Wagner yard with Willy.

7    Shortly thereafter, Willy came over to Superior and provided them with a Material Safety Data

8 Sheet (MSDS) for a substance called Plasti-Kote.[1/]  The MSDS indicated that Plasti-Kote was made of

9 20% acrylic polymer in 80% xylene.  Willy told the Ready Mix supervisor that Plasti-Kote was the

10 material that had spilled at Wagner and that he had contacted an environmental consulting firm to clean

11 up the spill.

12    At about 2:30 p.m., seeing no clean up activity at Wagner, the Ready Mix supervisor called 911

13 and reported the problem.  At about 3:00 p.m., the Lakeside Fire Department responded.  Willy Garcia

14 informed them that two 55 gallon drums fell off a pallet, spilling about 25 gallons  into the nearby creek

15 when an employee was attempting to move the drums with a forklift.  The Fire Department

16 representatives saw no evidence of a spill on the concrete pad near the creek bed or anywhere along the

17 bank of the creek.  If the drums had fallen off the forklift as Willy had described, according to the first

18 responders, they would have rolled back towards the office and not into the creek, due to the slope of

19 the property.

20    The Fire Department representatives saw approximately six black plastic 55 drums on the

21 Wagner property.  The drums were all crushed as if they were flattened by the forklift, and they had

22 holes in them.  They observed a pick axe near the crushed drums and believed it was the tool used to

23 make the holes in the drums.  They observed no other black plastic 55 gallon drums on the property.

24    A representative of DEH arrived at Wagner at about 3:40 p.m.  He observed a plastic

25 film floating on top of the water in the creek behind the Wagner property, and a strong odor of what he

26

27

28

---

[1/]    Plasti-Kote is used by people in the construction trade to coat their equipment to be used
with wet concrete, as it makes the equipment much easier to clean.

3

1  believed to be xylene or toluene (both solvents). He collected two samples of the film floating on the
2  creek.

3      Another DEH representative photographed five crushed black plastic 55 gallon drums with holes
4  in them in the corner of the Wagner property between the large building and the conex box. He looked
5  inside all the buildings and containers on the Wagner property and these crushed five drums were the
6  only black plastic 55 gallon drums on the site. He was told that the crushed drums had contained the
7  material that was spilled (Plasti-Kote). He obtained a sample of the material by pouring the remaining
8  contents of each drum, either through the bung opening or some other puncture hole in the drum, into
9  a five gallon plastic bucket, and then sampling the material in the bucket. This sample was analyzed
10 and found to have a flash point of 68 degrees Fahrenheit (making it a federally regulated hazardous
11 waste having the characteristic of ignitability), and to be composed primarily of toluene.

12     Willy Garcia told DEH that the release was an accident caused by an inexperienced forklift
13 operator, Ivan Oliver. Willy Garcia filled out a Wagner Construction accident report, dated March 31,
14 2005, which indicated at 11:00 a.m. on March 31, 2005, "a laborer was moving drums from corner of
15 conex box w/forklift and they slid off the forks onto the bank of storm drain causing the spill, laborer
16 could not pick up by hand as it was heavy and the acrylic wax seeped into the storm drain." The report
17 identified the employee involved as Ivan Oliver and the cause of the accident as "operator error." There
18 was a diagram attached to the accident report and on the diagram it was written "laborer swung to the
19 left then stopped to avoid hitting the overhead rain cover and the drums slid off the forks and on to the
20 bank causing the spill."

21     Around 3:30 p.m., Patriot Environmental Services ("Patriot") arrived on the site. Patriot had
22 been contacted by Willy Garcia of Wagner, who informed him that there had been a 30-40 gallon spill
23 of acrylic wax to a nearby creek. Patriot placed a boom across the creek and skimmed the wax-like
24 material from the surface. The spilled material appeared to have traveled at least 2,000 feet downstream
25 of the Wagner property.

26     The following Monday, on April 4, 2005, Patriot discovered an unexpected area of
27 contamination on the Wagner property. A black, oil-like substance was seeping from the rip-rap along
28 the bank. Willy told Patriot "it's not from us." A backhoe operator moved the large pieces of concrete

4

1  out of the way to further investigate. The ground beneath the concrete was wet and smelled strongly

2  of solvent. The contaminated soil showed the material contained high levels of toluene, with the highest

3  levels found about five feet below the surface. Patriot representatives believed that the contents of all

4  of the five crushed 55 gallon drums were dumped at the location, due to the degree of soil

5  contamination. Eleven roll-off dumpsters of toluene contaminated soil were later removed from the

6  location.

7       A DEH representative arrived at the Wagner site on April 4, 2005, and spoke with Willy Garcia.

8  Willy told him that an employee of Wagner was in the process of moving two 55 gallon drums of Plasti-

9  kote with a fork lift when the drums fell on the concrete slab and spilled approximately 30 gallons of

10  the substance. Willy told DEH that the spilled liquid flowed onto a dirt patch adjacent to the slab, after

11  which staff placed soil on the standing liquid in order to absorb it.

12      DEH spoke to Willy Garcia again on April 12, 2005, at the Wagner yard. Willy told DEH that

13  they punched the holes in the drums to vent them before they were crushed or disposed of. Willy

14  believed that the drums were punched with holes by another employee, Ivan Oliver, a couple days

15  before the spill to air them out. The drums in the photograph taken by Anderson of Superior Ready Mix

16  the morning of the spill do not appear to be punctured.

17      Willy stated that he was not present when the spill happened but he believed that the spill

18  occurred between 10:00 a.m. and noon on March 31, 2005, when Ivan Oliver was moving two drums

19  with a forklift. Oliver stopped suddenly while backing up and the drums or a drum tipped over and

20  spilled. Willy stated that Oliver did not phone anyone because he didn't have a cell phone. Willy said

21  that he did not call the authorities to report the spill because he was busy trying to get a clean up

22  contractor to come. Telephone records reveal that the first call to a clean up company by Willy Garcia

23  appears to have occurred at approximately 3:00 p.m., after the Fire Department had responded to the

24  site. Willy advised DEH that he (Willy) had crushed the drums with a forklift in preparation for

25  disposal.

26      RoMix, the manufacturer of Plasti-Kote, advised that Plasti-Kote is made of acrylic polymers

27  and is blended with either toluene or xylene, depending on which solvent was more economical at the

28  moment. The five 55 gallon drums of Plasti-Kote sold by RoMix to Wagner Construction in 2002 and

5

1    March of 2003 were blended with toluene. RoMix no longer manufactures Plasti-Kote, but instead

2    makes a similar product that is water-based, due to the potential flammability hazards associated with

3    a solvent-based product. A product with high solvent content, according to RoMix, would be more

4    expensive to dispose of than a water-based product.

5    On April 20, 2005, agents interviewed Ivan Garcia Oliver at a Starbucks coffee shop. Oliver

6    stated that he had been employed full time by Wagner Construction in Lakeside since 2003. Oliver was

7    the only one who worked in the yard, and was supervised by Willy Garcia. Oliver stated that he was

8    working in the Wagner yard on March 31, 2005, attempting to clean an area where materials were stored

9    near about six 55 gallon drums. Oliver used a forklift to try to move the drums to get better access to

10   the area for cleaning. Oliver stated that he loaded the two 55 gallon drums upright onto the forklift

11   without using a pallet, and the drums subsequently toppled off when Oliver made an abrupt stop while

12   backing the forklift. Oliver drew a diagram for the agents of the location.

13   Oliver said that the drums spilled a clear liquid substance down the bank and into the nearby

14   creek. He tried to set them upright but they were too heavy for him. He looked for something in the

15   yard to contain the spill but was unable to find anything. He did find a rig to help him set the drums

16   upright but by the time he returned to the area with the drums, just about all of their contents had already

17   spilled.

18   Oliver advised that he was alone in the yard when the spill occurred, some time in late morning

19   or early afternoon on the 31st. Oliver attempted to contact Willy Garcia but was unable to reach him

20   and so continued working. Oliver said that he made the holes in the empty drums at the direction of

21   Willy Garcia, to air them out in preparation for disposal. Oliver denied that Willy Garcia or anyone else

22   at Wagner directed him to dump the contents of the drums, insisting it was an accident. Oliver stated

23   that he was not instructed to shovel out any of the contaminated soil or cover the spill. Oliver stated that

24   he had no personal relationship with Garcia outside of work, that Garcia was his boss and that was the

25   extent of the relationship. Agents later confirmed that Willy Garcia and Ivan Garcia Oliver are brothers.

26   //

27   //

28   //

III

MEMORANDUM OF POINTS AND AUTHORITIES

A.    THE GOVERNMENT HAS AND WILL CONTINUE TO COMPLY
WITH RULE 16 OF THE FEDERAL RULES OF CRIMINAL
PROCEDURE.  ANY ADDITIONAL DISCOVERY DEMANDS
OF THE DEFENDANT SHOULD BE DENIED

The Government has already produced approximately 1,716 pages of discovery.  Additional discovery will be produced as it is available.  The discovery produced is in excess of that required by Rule 16 of the Federal Rules of Criminal Procedure. The Government will continue to comply with the rules concerning discovery.  The defendant's specific requests are discussed below.

1.    The Government has Already Disclosed Information
Subject to Disclosure Under Rule 16(a)(1)(A) and (B)
of the Federal Rules of Criminal Procedure

The Government has already disclosed all relevant written and recorded statements of the defendants as well as the substance of any relevant oral statements of the defendants made in response to questions by government agents currently in possession of the Government.  A memorandum is being prepared regarding the arrest of Guillermo Garcia and any post arrest statements, and that will be disclosed as soon as it is available to government counsel. The defendants are not entitled to summaries of oral statements of the defendants made to persons not known by them to be government agents, and the memorialization of any such statements in a written report does not make them discoverable as "written" statements of the defendant.  United States v. Hoffman, 794 F.2d 1429, 1432, n.4 (9th Cir. 1986).

2.    The Government Will Comply With Rule 16(a)(1)(D)

The Government has already provided the defendants with a copy of their record of prior convictions.

The Government is well aware of and will fully perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment, as well as its duty under Giglio v. United States, 405 U.S. 150 (1972) to provide information on any benefits provided to

1   Government witnesses in exchange for their testimony, and under <u>United States v. Henthorn</u>, 931 F.2d

2   29 (9th Cir. 1991), to disclose information in the personnel records of testifying agents for evidence of

3   dishonesty.

4                    3.        The Government Will Comply With Rule 16(a)(1)(E)

5          The Government will permit the defendant to inspect and copy or photograph all books, papers,

6   documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the

7   possession, custody, or control of the Government, and which are material to the preparation of the

8   defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were

9   obtained from or belong to the defendant, and agrees to preserve such evidence during the pendency of

10  this proceeding.

11         The defendant is not entitled to all evidence known or believed to exist which is, or may be

12  favorable to the accused, or which pertains to the credibility of the Government's case.  As stated in

13  <u>United States v. Gardner</u>, 611 F.2d 770 (9th Cir. 1980), it must be noted that: "[T]he prosecution does

14  not have a constitutional duty to disclose every bit of information that might affect the jury's decision;

15  it need only disclose information favorable to the defense that meets the appropriate standard of

16  materiality." <u>Id.</u>, 611 F.2d at 774-775 (citations omitted). <u>See also</u> <u>United States v. Sukumolachan</u>, 610

17  F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not

18  exist); <u>United States v. Flores</u>, 540 F.2d 432, 438 (9th Cir. 1976) (<u>Brady</u> does not create any pretrial

19  discovery privileges not contained in the Federal Rules of Criminal Procedure).

20                   4.        The Government Will Comply With Rule 16(a)(1)(F)

21         The Government will permit the defendant to inspect and copy or photograph any results or

22  reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof,

23  which are within the possession of the Government, and by the exercise of due diligence may become

24  known to the attorney for the Government and are material to the preparation of the defense or are

25  intended for use by the Government as evidence-in-chief at the trial.  Copies of the reports of the results

26  of scientific testing performed by the Government, as well as the testing performed by Patriot,  to date

27  have been disclosed.  Additional testing is being performed by the U.S. Environmental Protection

28  Agency and the report of the results of such testing will be provided to the defense as soon as it is

8

1  available to Government counsel. When the experts who will testify at trial are identified from among

2  the many individuals who conducted scientific testing, a full summary of their opinions, including the

3  bases and reasons for the opinions and the witness's qualifications will be disclosed.

4              5.      The Defendant is Not Entitled to the
                       Disclosure of Witness Statements Prior
5                      to the Witness Testifying on Direct
                       Examination at Trial
6

7          Production of these statements is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur

8  only after the witness testifies on direct examination. United States v. Taylor, 802 F.2d 1108, 1118

9  (9th Cir. 1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir.), cert. denied, 454 U.S. 902 (1981).

10  Indeed, even material believed to be exculpatory and therefore subject to disclosure under the Brady

11  doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such

12  time as the witness statement is disclosed under the Act. See United States v. Bernard, 623 F.2d 551,

13  556 (9th Cir. 1979). Although the Government usually will agree only to disclose the statements of

14  witnesses no later than five days prior to trial, provided that defense counsel has complied with his

15  obligations under Federal Rules of Criminal Procedure 12.1, 12.2, 16 and 26.2, and provided that

16  defense counsel will turn over all "reverse Jencks" statements at that time, in this case, all witness

17  statements in the possession of government counsel have been disclosed.

18              6.      The Government Objects to the Full Production
                       of Agents' Handwritten Notes at This Time
19

20          Although the Government has no objection to the preservation of agents' handwritten notes, the

21  Government objects to defendant's request for his full production for immediate examination and

22  inspection. If, during any evidentiary proceeding, certain rough notes become relevant, these notes will

23  be made available.

24          Prior production of these notes is not necessary because they are not "statements" within the

25  meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness'

26  assertions and they have been approved or adopted by the witness. United States v. Spencer, 618 F.2d

27  605, 606-607 (9th Cir. 1980); see also United States v. Griffin, 659 F.2d 932, 936-938 (9th Cir. 1981),

28  cert. denied, 456 U.S. 949 (1982).

7.     TECS Reports

There are no TECS reports related to this case to the knowledge of government counsel.

8.     Evidence Seized

No evidence was seized pursuant to a search of the defendant or his property in this case.

9.     Prior Similar Act or 404(b) Evidence

Government counsel is currently aware of no evidence of prior similar acts by defendant Garcia. Should such evidence come to light, it will be disclosed immediately.

10.     Dispatch Tapes and Radio Traffic

The defendant was arrested by the FBI pursuant to an arrest warrant. No dispatch tapes or copies of radio traffic relating to the arrest exist to the knowledge of government counsel.

B.     THE GOVERNMENT HAS NO OBJECTION TO PRESERVING EVIDENCE

The defendant has moved for the preservation of "all dispatch tapes and any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody or care of the Government and which relates to the arrest or events leading to the arrest in this case." While no dispatch tapes exist in this case, or any other physical evidence relating to the arrest, the government is in possession of a portion of the sample of liquids taken from the drums at Wagner Construction on March 31, 2005, by the San Diego County Department of Environmental Health. The government will continue to preserve that sample as potential evidence.

C.     THE GOVERNMENT DOES NOT OBJECT TO FILING FURTHER MOTIONS

Defense counsel filed the current pending motions prior to receiving any discovery from the government. Both counsel for the government and counsel for the defense were anticipating the need to continue the motion date in this case to allow the codefendant to be present. The prompt filing of these motions allows the tolling of the Speedy Trial clock, pending the arrival of the co-defendant in this district, pursuant to Section 3161(h)(1)(F) of Title 18 of the United States Code. The government has no objection to the filing of additional motions by defendant Garcia, once discovery has been produced.

1

2

IV

CONCLUSION

3     On the basis of the foregoing, the Government respectfully requests that Defendant's Motion for

4  Discovery be denied, to the extent that they are opposed by the Government.  The Government does not

5  oppose the Defendant's Motions To Preserve Evidence and To File Further Motions.

6     DATED:  January 7, 2008.

7                                         Respectfully submitted,

8                                         KAREN P. HEWITT
                                          United States Attorney
9

10

11                                        MELANIE K. PIERSON
                                          Assistant United States Attorney
                                          Attorneys for Plaintiff
12                                        United States of America
                                          Melanie.Pierson@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 07CR3192-IEG |
| | ) | |
| Plaintiff, | ) | CERTIFICATE OF SERVICE |
| | ) | BY PERSONAL SERVICE IN COURT |
| v. | ) | |
| | ) | |
| GUILLERMO GARCIA (1), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED that:

I, Melanie K. Pierson, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893; I am not a party to the above-entitled action; and

I personally served in court a copy of the Government's Response in Opposition to Defendant's Motions to Compel Discovery; to Preserve Evidence; and for Further Motions, to Kurt David Hermansen, Esq., attorney for Defendant Guillermo Garcia.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, January 7, 2008.